UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ROBERT J. LAMBERT, et al.,

        Plaintiff(s),

v.                                                                    Case No.  1:05-CV-596

ROBERT STOKES, et al.,                            HON. GORDON J. QUIST
                                                                     United States District Judge

        Defendant(s).

_____/

**UNITED STATES MEMORANDUM IN SUPPORT**
**OF MOTION FOR PARTIAL SUMMARY JUDGMENT**

The United States of America, pursuant to Fed.R.Civ.P. 56, moves this Court for partial[1]

summary judgment against the defendants on all counts of its complaint and intervention.  The

defendants are estopped by defendant Robert Stokes's, criminal conviction on multiple counts of

Health Care Fraud (HCF) from denying liability under the False Claims Act (FCA), 31 U.S.C. §

3729 *et seq*., for the same conduct.  Further, since there is no material dispute of fact with regard

to the defendant's liability for FCA violations and the resulting damages, the Court should find

the defendants jointly and severally liable for the treble damages and civil penalties that are

mandated by the FCA.  The doctrine of collateral estoppel also applies to the United States'

common law claims of fraud and unjust enrichment.

---

[1]This motion is described as a request for partial summary judgment because it does not move for summary judgment on all counts of the relator's complaint.  Summary judgment is requested on all counts of the United States's complaint in intervention.

**Preliminary Statement**

The United States requests that the Court enter summary judgment in its favor on all counts of its complaint in intervention.  In Counts I, II, and III, the United States seeks treble damages and civil penalties under the FCA, 31 U.S.C. § 3729 *et seq*., for defendant's participation in a scheme to defraud the United States by billing 8,481 false claims for payment to the Medicare program.  The false claims were submitted for conditions that did not exist or procedures that were not performed.  Specifically, Dr. Stokes billed Medicare for full thickness excisions when instead he performed medically less intensive shave excisions.  Dr. Stokes also billed Medicare for a procedure described as "adjacent tissue transfer" (ATT), when instead he performed a less complex procedure.  Finally, when his surgical patients returned for routine post-surgical follow-up visits - - visits that were not separately compensable - - Dr. Stokes falsely diagnosed them with impetigo so that he could bill for an office visit that would get paid by Medicare.  This conduct served as the basis of Dr. Stokes' criminal conviction on 31 counts of Health Care Fraud in violation of 18 U.S.C. § 1347.  As a result of his criminal conviction, Dr. Stokes was ordered to pay criminal restitution to the Medicare program in the amount of $610,042.

Dr. Stokes' criminal conviction estops the defendants from denying their FCA liability as alleged in Counts I, II, and III of the complaint and intervention, as well as the United States' common law claims, Counts IV and V.  Furthermore, he is estopped from contesting the amount of the loss suffered by Medicare, which amount was the subject of litigation at the sentencing hearing.  Therefore, no material facts are in dispute with respect to defendant's fraudulent conduct or damages and summary judgment in the government's favor is appropriate.

2

**Facts**

Defendant, Robert Stokes, was a licensed dermatologist, who, at all times relevant to the first amended complaint, practiced medicine within the Western District of Michigan. (U.S. Compl., ¶ 6, Dkt. # 9; Defendant's Answer, ¶ 6, Dkt. # 14).   Defendant, Robert W. Stokes, D.O., P.C., is a Michigan professional corporation of Robert Stokes  The registered agent for the professional corporation is Robert Stokes, who is also the president and sole shareholder of the professional corporation.  (U.S. Compl., ¶ 7, Dkt. # 9; Defendant's Answer, ¶ 7, Dkt. #14).

In the course of this practice, defendants provided evaluation and management services and general surgical procedures to their patients.  (U.S. Compl., ¶ 12, Dkt. # 9; Defendant's Answer, ¶ 12, Dkt. # 14). The evaluation and management services provided by defendants included office visits during which the defendant, Robert Stokes, took a history from his patients, performed an examination, and exercised medical decision-making to arrive at a diagnosis and treatment for his patients.  (U.S. Compl., ¶ 13, Dkt. # 9; Defendant's Answer, ¶ 13, Dkt. # 14).

The general surgical procedures performed by defendants included the removal of lesions by various methods of excision.  Additionally, when appropriate, the wound remaining after the surgical excision was closed by one of many closure techniques.  (U.S. Compl., ¶ 14, Dkt. # 9; Defendant's Answer, ¶ 14, Dkt. # 14).

During the relevant time period, defendants billed insurers for these evaluation and management services as well as the general surgical procedures, by utilizing certain code numbers provided for in the *Current Procedural Terminology Manual*, or *CPT Manual*. Defendants were also required to specify a diagnosis code as set forth in the *ICD-9-CM Manual.* (U.S. Compl., ¶ 15, Dkt. # 9; Defendant's Answer, ¶ 15, Dkt. # 14).

3

Case 1:05-cv-00596-GJQ ECF No. 28, PageID.197 Filed 11/26/08 Page 4 of 26

Defendants submission of billings pursuant to the *CPT Manual* included the submission of billings to Medicare, a health care benefit program as defined in 18 U.S.C. § 24(b), as Medicare provided a contract of insurance affecting interstate commerce in the providing of medical benefits and services to certain specified individuals. (U.S. Compl., ¶ 16, Dkt. # 9; Defendant's Answer, ¶ 16, Dkt. # 14). Medicare provided insurance benefits to the patients of defendants pursuant to "Part B", which authorized payments for professional services rendered by physicians. (U.S. Compl., ¶ 17, Dkt. # 9; Defendant's Answer, ¶ 17, Dkt. # 14).

Wisconsin Physician Services (WPS) contracted with CMS to process "Part B" claims in the state of Michigan. Pursuant to that agreement, WPS distributed federal Medicare funds to Michigan physicians who filed claims for payment. (U.S. Compl., ¶ 18, Dkt. # 9; Defendant's Answer, ¶ 18, Dkt. # 14). WPS required physicians to specify a diagnostic code and procedure code pursuant to the *CPT Manual* and *ICD-9-CM Manual* when submitting claims in order to be paid for professional services rendered to Medicare beneficiaries. Payment for services depended on the specific diagnostic and procedure codes indicated on the claim form. WPS distributed payments to participating providers by sending checks through the United States mail or by electronic transmission of funds. (U.S. Compl., ¶ 19, Dkt. # 9; Defendant's Answer, ¶ 19, Dkt. # 14).

In the course of submitting claims to Medicare, defendants submitted claims for payment for surgical procedures that were not performed (the adjacent tissue transfer (ATT), and lesion removal fraud described below), or for office visits for conditions that were non-existent (the impetigo fraud described below). (See U.S. Compl., ¶ 3, Dkt. # 9; Defendant's Answer, ¶ 3, Dkt. # 14). (Exhibit 1, Superseding Indictment) (Criminal Docket # 3). (U.S. Compl., ¶ 18-21, Dkt. #

4

9; Defendant's Answer, ¶ 18-21, Dkt. # 14).  (Exhibit 2, Verdict form indicating findings of guilty on 33 of 37 counts) (Criminal Docket # 62).  (Exhibit 3, Criminal Judgment dated December 27, 2007) (Criminal Dkt. # 100).

## Stokes' Indictment and Criminal Trial

On June 27, 2006, a grand jury returned a superseding indictment in Stokes' criminal case, charging Stokes with 72 counts of criminal Health Care Fraud.  (Exhibit 1, Superseding Indictment) (Criminal Dkt. # 3).  Counts 38 - 72, which were allegations regarding laboratory services, were subsequently dismissed by the United States.  Counts 1 - 37 charged Dr. Stokes with Health Care Fraud pursuant to 18 U.S.C. 1347.  Importantly, the indictment alleged a "scheme and artifice" by Dr. Stokes.  The superseding indictment described three theories of fraud which are discussed below.

## Adjacent Tissue Transfer (ATT)

Dr. Stokes executed his scheme and artifice by upcoding claims submitted to multiple insurers, including the Medicare program, for performing a procedure known as an "Adjacent Tissue Transfer" when he in fact performed a less complex procedure.  An ATT is a procedure for repairing a defect in the skin by creating a flap of skin, called an advancement flap, that is then rotated or moved in some fashion to cover a defect created by the removal of a lesion.  By specifying the CPT code for an ATT on the claims forms he sumitted, Stokes obtained higher levels of reimbursement than that to which he was entitled.  (Exhibit 1, Superseding Indictment, ¶ 18).

5

**Full Thickness Excisions (Size)**

Stokes further executed his scheme and artifice by upcoding claims submitted to insurers, including the Medicare Program, for performing lesion removals.  CPT codes for lesion removal were based upon the size, thickness and nature of the lesion removed: the larger the lesion and the thicker the tissue removed during the excision, the higher the rate of reimbursement.  Full thickness (through the dermis or skin) excisions were reimbursed at a higher rate than shaved (removing the top layer of the skin) excisions.  Finally, excisions of malignant lesions were reimbursed at a higher rate than removal of benign lesions.  To obtain more reimbursement than that to which he was entitled, Stokes billed Medicare and other insurance companies for full thickness excision of malignant lesions when, in fact, he performed a shaved excision of lesions which were often of a benign nature.  (Exhibit 1, Superseding Indictment, ¶ 19).

**Impetigo Fraud**

Stokes also executed his scheme and artifice, in part, by billing for services that he did not render.  Stokes billed Medicare and other insurance companies for office visits that were not separately reimbursable.  When Stokes performed the surgical procedures at issue, the reimbursement he received for the surgery included payment for the office visit that day and for any office visits associated with routine surgical follow-up.  Stokes was entitled to separate reimbursement for the office visit on the day of the surgery or during a routine follow-up visit if, and only if, he indicated on the claim that the office visit addressed a medical condition that was significant and separately identifiable from the condition that prompted the surgical procedure. Stokes circumvented these rules and received reimbursement for both the surgical procedures

6

and office visits on the day of the surgical procedure and the follow-up visits by indicating that the office visits were necessary to treat impetigo, a bacterial skin infection that occurs primarily in children.  In fact, the patients did not suffer from that condition.  (Exhibit 1, Superseding Indictment, ¶ 21).

## Instructions to the Jury

The court instructed the jury on Counts 1 - 9, 11 - 18, 20 - 24, and 26 - 37 of the Superseding Indictment, which alleged violations of 18 U.S.C. § 1347.[2]   The instructions were given as follows:

## 2.02
## Definition of Crime — Health Care Fraud

The indictment accuses the defendant of committing health care fraud. For you to find the defendant guilty of this crime, you must be convinced that the government has proved each and every one of the following elements, with respects to each count, beyond a reasonable doubt:

First, that the defendant knowingly devised a scheme or artifice to defraud a health care benefit program in connection with the delivery of or payment for health care benefits, items, or services by means of materially false or fraudulent pretenses or representations;

---

[2]18 U.S.C. § 1347 reads:

Whoever knowingly and willfully executes, or attempts to execute, a scheme or artifice -

(1) to defraud any health care benefit program; or
(2) to obtain, by means of false or fraudulent pretenses, representations, or promises, any of the money or property owned by, or under the custody or control of, any health care benefit program,

in connection with the delivery of or payment for health care benefits, items, or services shall be fined under this title or imprisoned not more than ten years... .

7

Second, that the defendant executed or attempted to execute this scheme or artifice to defraud;

Third, that the defendant acted knowingly with intent to defraud; and

Fourth, that the victim or intended victim was a "health care benefit program;" and

Fifth, that the scheme or artifice was executed in connection with the delivery or payment for health care benefits, items, or services.

"Health care benefit program" means "any public or private plan or contract, affecting commerce, under which any medical benefit, item, or service is provided to any individual.

If you are convinced that the government has proved all of these elements, say so by returning a guilty verdict on this charge.  If you have a reasonable doubt about any one of these elements, then you must find the defendant not guilty of this charge.

## Definition of Scheme To Defraud

The phrase "scheme or artifice to defraud" means any deliberate plan of action or course of conduct by which someone intends to deceive or to cheat another or by which someone intends to deprive another of something of value.

The term "false or fraudulent pretenses or representations" means a statement or an assertion which concerns a material or important fact or a material or important aspect of the matter in question and that was either known to be untrue at the time that it was made or used, or that was made or used with reckless indifference as to whether it was, in fact, true or false, and made or used with the intent to defraud.

"Intent to defraud" means to act with the specific intent to deceive, for the purpose of causing some financial or property loss to another.

A material fact is a fact that would be of importance to a reasonable person in making a decision about a particular matter or transaction.

The term "false or fraudulent pretenses or representations" includes actual, direct false statements as well as half-truths, and includes the knowing concealment of facts that are material or important to the matter in questions and that were made or used with the intent to defraud.

(See transcript of jury instructions. pp. 11-13 attached as Exhibit 4).

On April 26, 2007, the jury convicted Stokes on 31 of the 37 counts in the Superseding Indictment.  Seventeen (17) of the 31 counts involved patients insured by Medicare.  (Exhibit 2, Verdict Form, Criminal Docket # 62).  Count 10, regarding ATT, was voluntarily dismissed by the government before the verdict was returned.  The jury found Dr. Stokes guilty on 20 other counts of ATT.

### Stokes' Sentencing

At the sentencing phase of the trial, the United States and the defendant introduced competing statisticians to discuss the application of the fraudulent scheme found by the jury to the universe of claims submitted by Stokes.  The United States also provided projected loss amounts covering the fraudulent scheme from January 1, 2004 to December 31, 2006.  (The indictment only covered the period of August 1, 2001 to December 31, 2004).  The amount of the Medicare loss was submitted into evidence by the United States attached to its sentencing memo as Government Exhibit U.  (See Exhibit 5).

The court evaluated both statisticians and found the testimony of the United States witness, Dr. Gilliland, more credible than the witness offered by the defense.  The court stated:

> The government sample of Blue Cross Blue Shield of Michigan and Medicare claims from 2001 to 2003 provides an appropriate reasonable estimate of loss and results in an unbiased point estimate of the loss for the entire universe. ... Based on the testimony, I believe this sample can be projected for other insurers in other years because nothing changed between the time of the error, the time sampled, and the time when this kind of activity stopped.  So it is going to be applied to the same - - to the same extent.  (Sentencing Transcript, Exhibit 6) (Criminal Docket at 102, page 221).

On February 5, 2008, the court entered an amended judgment in the criminal case ordering total restitution to all victims of $1,315,682.93.  The court also specifically determined that the total amount of the loss to Medicare was $610,042, from 2001 until 2004.  (Exhibit 3, p. 5).[3]  The government now seeks treble damages and penalties under the FCA for the same conduct and loss proven in the criminal trial.

## Argument

### I._____LEGAL STANDARD

Summary judgment should be granted "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law ."  Fed. R. Civ. P. 56(c); *See Celotex v. Catrett*, 477 U.S. 317, 322 (1986); see also *DeJulio v. Georgia*, 290 F.3d 1291, 1294 (11th Cir. 2002).  Although all reasonable inferences must be drawn in the non-moving party's favor, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986), if the non-moving party fails to show that there are genuine issues of material fact, the moving party is entitled to judgment as a matter of law.  *Celotex*, 477 U.S. at 322-23.  "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.  Factual disputes that are irrelevant or unnecessary will not be counted."  *Anderson*, 477 U.S. at 248.  "A mere 'scintilla' of evidence is insufficient, because "there must be evidence on which the jury could reasonably find for the non-movant."  *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800

---

[3]Though the court found that the United States proved the validity of its estimate of the loss extending through 2006, the court truncated the loss amount to $610,042 because the court ruled in its memorandum regarding restitution that the amount was controlled by the dates in the indictment-August 2001 to December 2004.  (See Exhibit 7, Memorandum Order Regarding Restitution, pg. 5.)

(6th Cir. 2000).

**II.    THE UNITED STATES IS ENTITLED TO SUMMARY JUDGMENT ON COUNTS I, II, & III AGAINST DEFENDANTS PURSUANT TO THE FCA'S STATUTORY ESTOPPEL PROVISION AND COMMON LAW COLLATERAL ESTOPPEL**

   **A.    The Underlying Liability**

Stokes' criminal conviction for healthcare fraud under 18 U.S.C. § 1347 estops

Defendants from denying the essential elements of section 3729(a)(1) and (a)(2) of the FCA.

This is true both as a matter of statute and the common law.  Specifically, the FCA says:

> [N]otwithstanding any other provision of law, the Federal Rules of Criminal Procedure, or the Federal Rules of Evidence, a final judgment rendered in favor of the United States in any criminal proceeding charging fraud or false statements, whether upon a verdict after trial or upon a plea of guilty or nolo contendere, shall estop the defendant from denying the essential elements of the offense in any action which involves the same transaction as in the criminal proceeding and which is brought under subsection (a) or (b) of section 3730.

31 U.S.C. § 3731(d).

Section 3731(d) of the FCA codifies the common-law principle that a criminal conviction

"constitutes estoppel in favor of the United States in a subsequent civil proceeding as to those

matters determined by judgment in the criminal case'"  *United States v. Lamanna*, 114 F. Supp.

2d 193, 195 (W.D.N.Y 2000) (quoting *New York v. Julius Nasso Concrete Corp.*, 202 F.3d 82,

86 (2d Cir. 2000)).

Similarly, under common law it is well-established that issues decided by virtue of a

criminal conviction have a preclusive effect in any subsequent civil action.  *In re Raiford,* 695

F.2d 521, 523 (11th Cir. 1983) ("The use of a criminal conviction as conclusive of an issue in

subsequent civil litigation...is well established today.").  Thus, when an issue is resolved in favor

11

of the United States in a criminal prosecution, that issue may not be contested by the same defendant in a subsequent civil FCA suit brought by the government.  *See United States v. Killough*, 848 F.2d 1523, 1528 (11th Cir. 1988).  Moreover, "[b]ecause of the complainant's standard of proof is higher, and greater procedural protections attach in criminal prosecution, a conviction is a sufficiently reliable determination of the relevant issue."  *Raiford,* 695 F.2d at 523.  Thus, "[c]ollateral estoppel is particularly appropriate when the prior proceeding was a criminal action."  *United States v. Boutte*, 907 F. Supp. 239, 241 (E.D. Tex. 1995), *aff'd*, 108 F.3d 332 (5th Cir. 1997).

Accordingly, "[c]ase law fully supports the application of collateral estoppel to criminal convictions on the issue of liability in subsequent civil proceedings predicated on the False Claims Act."  *United States v. Peters*, 927 F. Supp. 363, 367 (D. Neb. 1996) (collecting cases), *aff'd*, 110 F.3d 616 (8th Cir. 1997).  In fact, courts regularly grant summary judgment as to liability under the FCA, where, as here, the essential facts giving rise to liability are established by the collateral estoppel effect of a prior criminal conviction or plea agreement.  *See, e.g., United States v. Ford*, 1994 WL 70853, *1 (6th Cir. March 2, 1994) (unpublished decision) (upholding summary judgment for the United States)*; United States v. Szilvagyi,* 398 F.Supp.2d 842, 849 (E.D. Mich. 2005); *United States ex rel. Virgin Islands Hous. Auth. v. Coastal Gen. Constr. Servs. Corp.,* 299 F. Supp. 2d 483, 485-88 (D.V.I. 2004); *United States v. Sazama*, 88 F. Supp. 2d 1270 (D. Utah 2000);  *United States v. Fliegler*, 756 F. Supp. 688, 693-95 (E.D.N.Y. 1990); *United States v. Nardone*, 782 F. Supp. 996 (M.D. Pa. 1990); *United States v. Diamond*, 657 F. Supp. 1204, 1204-05 (S.D.N.Y. 1987); *United States v. Cripps*, 460 F. Supp. 969 (E.D. Mich. 1978); *United States v. Schneider*, 139 F. Supp. 826 (S.D.N.Y. 1956); *United States v. Ben*

*Grunstein & Sons Co.*, 127 F. Supp. 907 (D.N.J. 1955).

Having established that both statutory and common law support the use of a criminal conviction to collaterally estop a defendant from contesting liability in a subsequent civil case, the only question for the court is whether the liability issues presented in this case are the same as those litigated in the criminal case.

As set forth below, not only do the elements of the statute for which Stokes was convicted map seamlessly against the elements of a violation of sections 3729(a)(1) and (a)(2) of the FCA,[4] these claims are the same claims that form the basis of 17 of the 31 counts of healthcare fraud upon which Stokes was convicted.  (Verdict, Exhibit 2).  Thus, the claims have already been determined to be false and/or fraudulently submitted in a court of law and there remains no material issue of fact in dispute with regard to them.

### 1.        Count One - Lesion Removal Fraud

In Count One of the Complaint in Intervention, the United States alleges that Defendant Stokes violated the FCA by "knowingly present[ing], or caus[ing] to be presented, to an officer or employee of the United States Government...a false or fraudulent claim for payment or approval," 31 U.S.C. § 3729(a)(1), or, in the alternative, by "knowingly mak[ing], us[ing], or caus[ing] to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government," 31 U.S.C. § 3729(a)(2), when from 2001 to 2006 he carried out a scheme to defraud Medicare by repeatedly billing full thickness excisions when in fact he

---

[4]*Compare* 18 U.S.C. § 1347 (making it a crime to use false or fraudulent pretenses to gain money from a heath care benefit program) *with* 31 U.S.C. §  3729(a)(1) (imposing liability for submitting a false or fraudulent claim for payment to a federal program), *and* 31 U.S.C. § 3729(a)(2) (imposing liability for using a false statement or record to obtain money from a federal program).

performed only shaved excisions.  (Compl. ¶ 55).  If the Government actually proved in the

criminal case that the defendant engaged in such a scheme, and the elements of proof in the

criminal case were the same as those alleged here, then the court should give preclusive effect to

the criminal judgment in this case in accordance with the law discussed above.

There is no question that the elements of the criminal and civil claims are the same.  In

order to convict Stokes of healthcare fraud under 18 U.S.C. § 1347, the jury had to find that

Stokes "knowingly and willfully execute[d], or attempt[ed] to execute, a scheme or artifice…to

obtain, by means or false or fraudulent pretenses, representations, or promises, any of the money

or property owned by, or under the custody or control of, any health care benefit program."  18

U.S.C. § 1347.  Thus, in order to convict Stokes of healthcare fraud under 18 U.S.C. § 1347 as to

LF, PB, and 4 additional Medicare patients, the jury had to find Stokes guilty of the essential

elements of a civil FCA violation.  Put differently,  the jury had to find Stokes guilty of either

knowingly presenting or causing to be presented a false claim to the government for payment,

which constitutes a violation of 31 U.S.C. § 3729(a)(1), or of knowingly making or using a false

statement or record to get a false or fraudulent claim paid by the government, which constitutes a

violation of 31 U.S.C. § 3729(a)(2).  Thus, pursuant to 31 U.S.C. § 3731(d), the jury's verdict

estopps the Defendants from denying the essential elements of FCA liability with respect to the

false claims that form the basis of both Stokes' criminal conviction and Count One of the

Amended Complaint.

There is also no question that the United States proved that the lesion removal fraud was

a scheme to defraud that continued from 2001 to 2006 as alleged in the Amended Complaint in

this lawsuit.  At trial, the United States offered proofs, and the jury rendered its verdict, on 8

14

substantive counts of lesion removal fraud for patients with dates of service by the Defendant spanning from 2001 to 2003. These are labeled "Full Thickness Excisions (Size)" on the Verdict form. (See Exhibit 2, p. 2). Similarly, Dr. Edward Yob, the Government's expert dermatologist, also testified regarding his review of 100 patient records covering the same time period. His review of these records revealed repeated instances where the Defendant billed for full thickness excisions but had only actually performed shave excisions. (Exhibit 8, pp. 323-347). Finally, at the sentencing hearing, the parties litigated the issue of the loss associated with the Defendant's fraudulent schemes. As a predicate to the finding of the loss was the issue of how long the Defendant carried out his scheme. Relying in part upon the Defendant's testimony that he always billed a shave excision of a malignant lesion as a full thickness excision because there was no CPT code for the shaving of a malignant lesion (Exhibit 9, Trial Testimony of Dr. Stokes, pp. 202-04), and the additional evidence that the Government presented, the Court specifically found that the Defendant's scheme continued into 2004, 2005 and 2006:

> The government's sample of Blue Cross Blue Shield of Michigan and Medicare claims for 2001 to 2003 provides an appropriate reasonable estimate of loss and results in an unbiased point estimate of the loss for the entire universe. Which is $626,823, with a standard error rate $87,175. Based on the testimony, I believe this sample can be projected for other insurers in other years because nothing changed between the time of the error, the time sampled, and the time this kind of activity stopped. So it's going to be applied to the same – to the same extent.

(Exhibit 6, Sentencing Transcript at pp. 220-221).

## 2. Count Two - The ATT Fraud

The United States has also already proven that the ATT fraud was a scheme to defraud that continued from 2001 to 2006 as alleged in the Amended Complaint in this lawsuit. Once again, the United States offered proofs, and the jury rendered its verdict, on 11 substantive counts

of ATT fraud for patients with dates of service by the Defendant spanning from 2001 to 2003.

(Exhibit 2, p. 1). Similarly, Dr. Edward Yob, the Government's expert dermatologist, also

testified regarding his review of 100 patient records covering the same time period. His review

of these records revealed repeated instances where the Defendant billed for closure of a wound

by way of an ATT when in fact he had only performed an intermediate or complex closure.

(Exhibit 10, Sentencing Transcript, pp. 174-175). The Government provided further evidence of

the nature of the Defendant's ATT scheme by introducing as evidence graphs of the Defendant's

billings for the various closure techniques. (Exhibit 11.) These exhibits demonstrated that the

Defendant's ATT scheme continued for many years by graphically illustrating that he almost

always billed for the most expensive closure technique – an ATT (Code 14000) – and virtually

never billed for an intermediate or complex closure (Codes 12000 and 13000). Finally, as with

the lesion fraud discussed above, the Court concluded at the sentencing hearing that the

Government provided sufficient evidence to support the conclusion that Defendant's ATT

scheme continued beyond the period of time set forth in the Indictment and proven at trial (2001

to 2004) and into 2005 and 2006 as alleged in the present Amended Complaint.

### 3. Count Three - The Impetigo Fraud

Finally, Defendant is collaterally estopped from denying his liability in this action for the

impetigo fraud. As with the other fraudulent schemes, the Government proved specific instances

of the impetigo fraud scheme by submission of proofs regarding particular patients who had been

treated by Defendant during 2001 to 2003. (Exhibit 12, Trial Testimony of Dr. Yob, pp. 382-

408). At the sentencing hearing, the Court found that the Defendant's impetigo fraud scheme

continued in 2004, 2005 and 2006. (Exhibit 6, Sentencing Transcript, p. 221, Criminal Docket at

16

102, cited above).  This conclusion was based upon the overwhelming evidence submitted at the

underlying trial and the sentencing hearing.  Specifically, Dr. Yob and Dr. Gray testified that a

dermatologist with a patient population similar to that of the Defendant would not see more than

20 to 25 cases of impetigo in any year.  Dr. Yob further testified that the existence of impetigo in

surgical patients (like the billings submitted by Dr. Stokes) is so rare that it almost never occurs.

(Exhibit 13, Testimony of Dr. Yob, at p. 353-354).  The Government submitted graphic

illustrations of the Defendant's billings showing that he billed the relevant insurers for hundreds

of cases of impetigo in the years in question.  (Government Exhibits 100 and 101 attached as

Exhibit 14).  Additionally, the Defendant testified at trial that even the healing of a wound with a

scab constitutes impetigo.  (Exhibit 15, Trial Testimony of Dr. Stokes, p. 183).  Given this

overwhelming evidence, and more importantly the findings of the jury and the Court in the

criminal case, Defendant is estopped from contesting liability for the impetigo fraud from 2001

to 2006 as alleged in Count Three of the present complaint.

## B.     The Defendant is Estopped from Contesting the Damages Associated with the Underlying Schemes to Defraud from 2001 to 2006

The *False Claims Act's* collateral estoppel provision does not just apply to findings of

liability in a criminal case.  To the contrary, courts have repeatedly relied upon 31 U.S.C. §

3731(d) in holding that a court's finding of the amount of restitution in a criminal case precludes

the Defendant from contesting the amount of the loss associated with the underlying fraudulent

schemes in a subsequent action under the FCA.

The court in *United States v. Convalescent Transports, Inc.*, 2007 WL 2090210

(E.D.N.C. 2007) found that the restitution ordered in the criminal cases "represents the amount of

damages the government sustained because of the acts of defendants, for purposes of 31 U.S.C. §

3729(a)." *Convalescent Transports,* at *6, citing *United States v. Szilvagyi*, 398 F.Supp.2d at

849, 850 (E.D. Mich. 2005) (awarding treble damages based on restitution figure found by court

in related criminal prosecution for health care fraud). *See also United States v. Bickel*, 2006 WL

1120439, *4 (C.D. Ill. 2006) (trebling actual damages portion of restitution amount from

underlying criminal action); *United States v. Peters*, 927 F.Supp. 363, 368 (D. Neb. 1996)

(trebling restitution award).

        In the present case, the Government proved the underlying restitution amount for

Medicare by statistical evidence at the sentencing hearing.  Defendant had every opportunity to

present, and did present, his own evidence on the issue of loss, including his own expert

statistician.  The Court specifically found that the Government's statistical method was valid.[5]  In

addition, the court expressly stated during Dr. Stokes's sentencing that "this sample can be

projected for other insurers in other years [beyond 2001 to 2004] because nothing changed

between the time of the error, the time sampled, and the time this kind of activity stopped.  So it

is going to be applied to the same – to the same extent."  (Exhibit 6, Sentencing Transcript at pp.

220-21).    At sentencing, the court ordered that the loss to Medicare between August 2001 and

December 2004 was $610,042 for purposes of restitution.  For purposes of the civil complaint,

---

        [5] There is little question that statistical methodology is an appropriate means of proving
loss in criminal and civil health-care fraud cases.  *See*, Government's Sentencing Memoranda at
pp. 5-6 attached as Exhibit 12, Criminal Docket # 100).  *See also*, *United States v. Freitag*, 230
F.3d 1010, 1025 (7th Cir. 2000) (upholding statistical sampling, noting that "[I]n this case, the
large number of fraudulent claims (over 8,000) and the extensive period over which the claims
were submitted (seven years) made a precise calculation of loss impractical." *Id.; see also United
States v. Conner*, 262 Fed. Appx. 515, 519 (4th Cir. 2008) ("Extrapolation is an acceptable
method to use in making a reasonable estimate of the amount of loss under the sentencing
guidelines.")

the United States utilizes the amount calculated by the court for the years 2001 - 2004, and also

the additional money paid by Medicare from 2005 to 2006 ($217,166).  This amount is calculated

by applying the same statistical amount validated by the court at the sentencing hearing and

implemented by the court for determining restitution to the billings of Dr. Stokes in 2005 and

2006 for the procedures discussed above.  (Exhibit 5, U.S. Exhibit U to Sentencing

Memorandum).  Pursuant to § 3731(d), Defendant is estopped from contesting this calculation in

this case.

III.    **COMMON LAW COLLATERAL ESTOPPEL IMPOSES LIABILITY AND DAMAGES FOR COUNTS FOUR AND FIVE OF THE AMENDED COMPLAINT**

The doctrine of collateral estoppel or issue preclusion provides that "once an issue is

actually and necessarily determined by a court of competent jurisdiction, that determination is

conclusive in subsequent suits based on a different cause of action involving a party to the prior

litigation."  *Wolfe v. Perry*, 412 F.3d 707, 716 (6th Cir. 2005), *citing, Montana v. United States*,

440 U.S. 147, 153 (1979).  Application of the doctrine of issue preclusion serves very important

public policy considerations by preventing relitigation of issues and conserving judicial time and

resources.  *Southwest Airlines Co. v. Texas International Airlines*, 546 F.2d 84, 94 (5th Cir.

1977).

Federal common law governs the determination to be given to federal court judgments.

*In re Trantham*, 304 B.R. 298, 305 (6th Cir. 2004).  Although state law governs the preclusive

effect to be given to state court judgments in federal diversity actions, "federal issue preclusion

law applies to federal judgments in federal question cases."  *Id.  See also, In re Byard*, 47 B.R.

700, 702 nt. 1 (W.D. Tenn 1985), *citing, Johnson v. United States*, 576 F.2d 606 (5th Cir. 1978);

*Laborers' Pension Trust Fund-Detroit and Vicinity v. Lange*, 825 F. Supp. 171, 175 (E.D. Mich.

1993) ("in non-diversity cases in federal court, federal collateral estoppel rules apply in

determining the effect of a prior judgment").

As noted in *Wolfe, supra*, "[T]hough the exact requirements necessary to invoke

collateral estoppel are listed slightly differently in our various opinions," the general elements are

as follows:

> (1) the issue in the subsequent litigation is identical to that resolved in the earlier
>     litigation;
>
> (2) the issue was actually litigated and decided in the prior action;
>
> (3) the resolution of the issue was necessary and essential to a judgment on the
>     merits in the prior litigation;
>
> (4) the party to be estopped was a party to the prior litigation (or in privity with
>     such a party); and,
>
> (5) the party to be estopped had a full and fair opportunity to litigate the issue.

*Wolfe*, 412 F.3d at 716.

"Originally, collateral estoppel was limited by the principle of mutuality, which provided

that neither party could use a prior judgment as an estoppel against the other unless both parties

were bound by the judgment." *Laborers' Pension Trust Fund-Detroit and Vicinity*, *supra*, at

175-176. However, this mutuality requirement has been abandoned. *Id*. "Now, a party may rely

on collateral estoppel even though he or she is not bound by the prior judgment if the party

against whom it is used had a full and fair opportunity and incentive to litigate the issue in the

prior action." *Id*.

20

The fulfillment of all of these elements forecloses Plaintiff from re-litigating the issues of liability and damages (in the present litigation) .

1.    **Count Four - Common Law Fraud - Lesion Removal, ATT and Impetigo**

In order to establish Common Law Fraud, the United States must establish these elements of fraud:

(1) that defendant made a material representation;

(2) that it was false;

(3) that when he made it he knew that it was false, or made it recklessly, without any knowledge of its truth, and as a positive assertion;

(4) that he made it with the intention that it should be acted upon by plaintiff;

(5) that plaintiff acted in reliance upon it; and,

(6) that he thereby suffered injury.

*Hi-Way Motor Co. v. International Harvester Co.*, 398 Mich. 330, 336, 247 N.W.2d 813, 816 (Mich. 1976).

Dr. Stokes' criminal conviction establishes the requisite elements for Common Law collateral Estoppel on this claim as follows:

(1) the issue in the subsequent litigation is identical to that resolved in the earlier litigation;

*Stokes' conviction was for criminal health care fraud in violation of 18 U.S.C. 1347 as described above. The United States established that Stokes used false or fraudulent pretenses to gain money from a health care program. The elements of the statute correspond directly to the elements of common law fraud.*

21

(2) the issue was actually litigated and decided in the prior action;

*The criminal trial resulted in Stokes conviction and the Court's order for criminal restitution. Both the criminal conviction and the amount of restitution were fully litigated by both sides.*

(3) the resolution of the issue was necessary and essential to a judgment on the merits in the prior litigation;

*The central issue of the criminal Indictment, trial, jury instructions and verdict was Stokes' scheme to commit criminal health care fraud. Both criminal liability for 18 U.S.C. § 1347 and establishment of the proper manner to calculate restitution were necessary and essential to the judgment rendered by the court in the criminal case.*

(4) the party to be estopped was a party to the prior litigation (or in privity with such a party); and

*Stokes was a party (the defendant) in the criminal litigation. Robert Stokes, P.C. was a professional corporation wholly owned by Stokes, and was in privity with him.*

(5) the party to be estopped had a full and fair opportunity to litigate the issue.

*Stokes had a full opportunity, and did, litigate the issue of his criminal liability during the lengthy criminal trial. He also contested the issue of the amount of damages and restitution to be awarded during the sentencing phase of the trial.*

Accordingly, the principles of finality and judicial efficiency supporting the doctrine of collateral estoppel apply squarely to Stokes' case. The United States respectfully requests that the court determine, if it finds that Stokes' is not liable under the FCA, that he is liable under a theory of common law fraud and award the United States its damages of $827,208.

The United States also submits that, should the court find that the FCA's estoppel provision argued in section A, *supra*, does not apply as to damages, that the common law of collateral estoppel is applicable to the restitution ordered by the court.

## 2.   Count Five - Unjust Enrichment - Lesion Removal, ATT and Impetigo Fraud

In order to sustain a claim of unjust enrichment, the government must establish:

22

     (1) the receipt of a benefit by Stokes from the United States; and,

     (2) an inequity resulting to the United States because of the retention of the benefit by Stokes.

*Bell Isle Grille Corp. v. City of Detroit*, 256 Mich.App. 463, 479, 66 N.W.2d 271, 281

(Mich.App. 2003).

     In the instant case, the conviction of Stokes for 33 counts of violating 18 U.S.C. § 1347 establishes conclusively both elements of unjust enrichment.  Stokes received a benefit, and the United States suffered inequity when Stokes retained benefits to which he was not entitled.  All of the elements of collateral estoppel discussed above apply equally here.  Therefore, the United States respectfully requests that the Court grant damages of $827,208.

## IV.    FCA TREBLE DAMAGES

### A.    DEFENDANT IS LIABLE FOR TREBLE DAMAGES UNDER THE FALSE CLAIMS ACT

     Upon the finding of liability under the FCA, the United States is entitled to treble damages in the amount of the false claims.  31 U.S.C. § 3729(a).  As stated above, based upon the Court's rulings during the restitution phase of the criminal trial, single damages from Dr. Stokes' conduct between 2001 and 2006 total $827,208.  As stated above, total single damages to Medicare, calculated using the method approved by this Court during the restitution phase of the criminal trial, are $827,208.  Treble damages total $2,481,624.

     Further, "individuals and corporations can be sued together in one action, with each being jointly and severally liable for the total treble damages and civil penalties sought." *United States v. Cabrera-Diaz*, 106 F.Supp.2d 234, 242 (D.P.R. 2000) (collecting cases); *Mortgages, Inc. v. United States District Court for the District of Nevada*, 934 F.2d 209, 212 (9th Cir. 1991) (where

one or more persons have committed a fraud upon the government in violation of the FCA, each

is jointly and severally liable for the treble damages and statutory penalty) (citations omitted);

*United States v. Aerodecks*, 469 F.2d 1002, 1003 (5th Cir. 1972) (holding corporation and

individual employee jointly and severally liable for treble damages and statutory penalties under

the FCA).  It is uncontested in this matter that defendant Robert W. Stokes, P.C. is a Michigan

professional corporation of Robert Stokes.  Stokes is the registered agent for the professional

corporation, president and sole shareholder.  As such, the P.C. may held liable for each and every

action of Dr. Robert W. Stokes under the legal doctrine of respondeat superior.  The doctrine

imposes liability on a company based on the actions of an employee-agent when the company

actively promoted or sponsored the scheme and benefitted from it.  *Davis v. Mutual Life Ins. Co.*

*of New York*, 6F3d 367 (6th Cir. 1993).   As Stokes was the sole physician employed in his

practice, and the sole physician charged and convicted in the criminal proceedings, as well as the

sole shareholder and president of the corporation, their actions are indistinguishable and

inextricably linked.  Therefore, the plaintiff the United States of America respectfully requests

this Court hold defendants Stokes and Robert W. Stokes, P.C. jointly and severally liable for the

total amount of damages and penalties assessed.

### B.   DEFENDANTS ARE JOINTLY AND SEVERALLY LIABLE FOR PENALTIES IN ADDITION TO TREBLE DAMAGES

The FCA states that once liability is established, the United States is entitled to statutory

civil penalties of "not less than $5,500 and not more than $11,000" for each claim.  31 U.S.C. §

3729(a).  As the FCA's legislative history makes clear, the imposition of civil penalties "is

automatic and mandatory" for each false claim and is not contingent upon proof of any damages.

S.Rep. 345 99 Cong. 2d.Sess. 8-10 (1986), reprinted in 1986 U.S.C.C.A. at 5266, 5273.

The number of false claims made during the scheme perpetrated by Stokes was 8,481 applying the error rate established at the restitution hearing to the total universe of claims from 2001-2006.  Use of this number of claims results in an excessive penalty.  Therefore, in order to avoid any appearance of overreaching, the United States requests penalties on the 17 claims proved in the criminal trial as described above.  As the Court is aware, this number is much lower than the universe of claims upon which penalties could potentially be assessed.  Thus, the United States requests the Court assess the maximum amount of $11,000 per false claim for a total of $187,000.  As argued  above, the defendant requests that these penalties be awarded jointly and severally against Stokes and Robert W. Stokes, P.C..

### Conclusion

The criminal conviction of Dr. Stokes proved that he engaged in a scheme to defraud the Medicare program during the years 2001 - 2006. The same conviction estopps him from denying civil liability under the FCA.  The United States therefore respectfully requests that the Court grant its motion for summary judgment against the defendant and award the United States treble damages in the amount of $2,481,624 and an additional $187,000 in statutory penalties for a total award of $2,668,624.

Respectfully submitted,

DONALD A. DAVIS
United States Attorney

Dated:   November 26, 2008                    */s/ J. Joseph Rossi*_____
J. JOSEPH ROSSI
Assistant United States Attorney
Post Office Box 208
Grand Rapids,  MI   49501-0208
(616) 456-2404
Email:  Joe.Rossi@usdoj.gov

26